# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MATTHEW R. SCHURR**
            **Plaintiff,**

            **v.**                                           **Case No. 12-C-0969**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
            **Defendant.**

---

## DECISION AND ORDER

Plaintiff Matthew Schurr applied for social security disability benefits, claiming that he could not work due to mental impairments, but the Social Security Administration ("SSA") denied his application initially (Tr. at 77-78) and on reconsideration (Tr. at 79-80). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), but the ALJ likewise found him not disabled. The Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word on plaintiff's application. See Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). Plaintiff now seeks judicial review of that decision.

## I. STANDARD OF REVIEW

The court reviews an ALJ's decision to ensure that he supported his conclusions with "substantial evidence" and applied the correct legal standards. Id. Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Under this deferential standard, the court may not re-weigh the evidence or substitute its judgment for the ALJ's. Pepper v. Colvin, 712 F.3d 351, 361-62 (7th Cir. 2013). If reasonable minds could differ over whether the claimant is disabled, the court must uphold

the decision under review.  Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012).  In rendering

his decision, the ALJ must build a logical bridge from the evidence to his conclusion, but he

need not provide a complete written evaluation of every piece of testimony and evidence.

Pepper, 712 F.3d at 362.   In analyzing an ALJ's opinion for fatal gaps or contradictions, the

court gives the opinion a commonsensical reading rather than nitpicking at it.  Shramek v.

Apfel, 226 F.3d 809, 811 (7th Cir. 2000).

## II.  DISABILITY STANDARD

In determining whether a claimant is disabled, the ALJ employs a sequential five-step

inquiry.  See, e.g., Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012).  At step one, the ALJ

asks whether the claimant is currently working, what the agency calls "substantial gainful

activity" ("SGA").  If the claimant is working at SGA levels, he will be found not disabled.  20

C.F.R. § 404.1520(a)(4)(i); 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not working, the ALJ determines whether he suffers from a

severe, medically determinable impairment or impairments.  An impairment is "severe" if it

significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R.

§§ 404.1520(a)(4)(ii) & (c); 20 C.F.R. §§ 416.920(a)(4)(ii) & (c).

Third, if the claimant has a severe impairment, the ALJ determines whether that

impairment qualifies as conclusively disabling under the Listings in the agency's regulations.

20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. § 416.920(a)(4)(iii).  To meet or equal a listed

impairment, the claimant must satisfy all of the "criteria" of the particular Listing.  Maggard v.

Apfel, 167 F.3d 376, 380 (7th Cir. 1999).  As is pertinent here, under the mental impairment

Listings, the claimant must under the "paragraph A" criteria substantiate medically the presence

of a particular mental disorder, and then under the "paragraph B or C" criteria demonstrate the

2

presence of the required impairment-related functional limitations.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 A.; see also 20 C.F.R. § 404.1520a (detailing the evaluation of mental impairments).

The paragraph B criteria have four components: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. The ALJ rates the degree of limitation in the first three areas on a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth area (episodes of decompensation) on a four-point scale: none, one or two, three, four or more.  20 C.F.R. § 404.1520a(c).  In order to be considered per se disabled, at least two of the following must be present: (1) marked restriction of activities in daily living; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of concentration, persistence, and pace; or (4) "repeated episodes of decompensation each of extended duration." Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010).

The paragraph C criteria require a medically documented history of a chronic organic mental disorder, schizophrenic disorder, or affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. See, e.g., Wiszowaty v. Astrue, 861 F. Supp. 2d 924, 940-41 (N.D. Ind. 2012).

3

If the claimant's impairment does not meet or equal a Listing, the ALJ proceeds to step four, determining whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 416.920(a)(4)(iv). RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8p.

Fifth, if the claimant cannot perform his past work (or if he lacks a relevant work history), the ALJ determines whether, given his RFC, age, education, and work experience, he can make the adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 416.920(a)(4)(v). The claimant bears the burden of presenting evidence at steps one through four, but at step five the burden shifts to the SSA. The ALJ may in recognition of this burden summon a vocational expert ("VE") to provide testimony regarding other jobs the claimant could do despite his limitations. See Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011).

## III. FACTS AND BACKGROUND

### A. Plaintiff's Application and Supporting Materials

On October 23, 2009, plaintiff applied for supplemental security income and disability insurance benefits, alleging a disability onset date of November 1, 2006. (Tr. at 145, 149.) In a disability report, plaintiff claimed that he could not work due to bipolar disorder, borderline personality disorder, and attention deficit disorder ("ADD"). He reported past employment at various restaurants from 2004 to 2009 but indicated that he had trouble keeping a job due to depression and mood swings. (Tr. at 171-72.) He received psychiatric treatment with Dr. Mathew McCarthy from September 2008 to October 2009 and from Dr. Stephen Callaghan from 1997 to 2002 (Tr. at 173-74); he received no treatment for mental illness between 2002

4

and 2008 (Tr. at 166, 177).[1]  He reported taking Adderall for ADD, Depakote for bipolar disorder, Trazodone for sleep, and Wellbutrin for depression.  (Tr. at 175.)  His highest level of education was eighth grade.[2]  (Tr. at 176.)

In a function report, plaintiff indicated that he got up, watched TV for two hours, worked for about four to six hours, then went home and to bed after more TV.  On days he didn't work, he spent four to six hours cooking and cleaning.  (Tr. at 178.)  He reported no problems with personal care, although he bathed, groomed, and shaved infrequently, and needed reminders to take his medications and encouragement to be productive.  (Tr. at 179-80.)  He prepared simple meals and performed household tasks such as cleaning, laundry, repairs, mowing, and cooking.  He did not drive because of a suspended license; he got around by walking or riding a bike.  (Tr. at 181.)  His hobbies included watching TV, playing guitar and drums, and reading. (Tr. at 182.)  He reported having no patience for anyone, never felt like being personable, and hardly ever was social.  He further reported that his mental impairments affected his memory and concentration but wrote that he followed written and spoken instructions "well."  (Tr. at 183.)  He stated that he got along "horribly" with authority figures and had been fired numerous times because of problems dealing with other people (Tr. at 184).

## B.    Medical Evidence

### 1.    Treatment Records

According to records from Kenosha Human Development Services ("KHDS"), on

---

[1]As discussed below, the medical records indicate that plaintiff commenced treatment with Dr. McCarthy in June 2007.

[2]Records from plaintiff's school show that he got mostly Ds and Fs in his classes, and that he was enrolled in a program for students with emotional/behavioral disabilities.  (Tr. at 297, 352-53.)

5

February 22, 2000, workers received a call from the dean of students at plaintiff's school, indicating that plaintiff – then age fourteen – "was acting very strange," laughing uncontrollably and asking bizarre questions, such as, "What if I killed my parents?"[3] (Tr. at 310.) The worker explained that someone would follow up that evening to make sure things were okay. The information was also passed on to plaintiff's case worker with the "Children Come First Program." (Tr. at 310.)

On January 30, 2002, a KHDS worker received contact from St. Luke's Hospital, indicating that plaintiff was there with his aunt trying to sign himself into the psychiatric ward. After some discussion regarding who needed to sign him in, it was determined that the aunt had guardianship and thus could do so. (Tr. at 309.)

On January 8, 2003, a KHDS worker received a call from a police officer indicating that he was at the Kenosha Hospital Emergency Room with plaintiff, who had overdosed on some medications. The worker responded to the hospital, where plaintiff advised that he took thirty to sixty Trazodone trying to kill himself. The officer and case worker decided that a chapter 51 commitment was appropriate.[4] (Tr. at 308-08.)

On April 22, 2007, the Kenosha County Jail contacted KHDS, advising that they had a potentially suicidal inmate. The worker responded and spoke to plaintiff, who was very friendly and cooperative, indicating that he was upset earlier that night because he was out drinking and returned home to find his fiancé with another man. He got into an argument with her, the police were called, and he ended up getting arrested. He admitted making some suicidal

---

[3]Plaintiff's parents were deceased, and he lived with his aunt. (Tr. at 310.)

[4]See Wis. Stat. ch. 51 (setting forth the procedures for committing a person due to mental illness and dangerousness to self or others).

6

statements in the patrol car but only because he was drunk and agitated. He denied current suicidal ideation, and the worker recommended that he return to the general population. (Tr. at 306.)

On June 4, 2007, plaintiff saw Dr. McCarthy for a psychiatric evaluation, on referral from KHDS, complaining of sleep problems and severe depression, and relating four previous admissions related to suicide attempts and self-mutilation. (Tr. at 235, 340.) He reported occasional drinking and some past marijuana use. (Tr. at 237, 342.) He related past treatment for ADHD with good response to Adderall; he also reported a good response to Zoloft. Dr. McCarthy diagnosed major depressive disorder, recurrent, rule out bipolar disorder, and ADHD, with a GAF of 55,[5] starting plaintiff on Adderall and Zoloft. (Tr. at 239, 344.)

Plaintiff returned to Dr. McCarthy on July 2, 2007, for follow up. Although Dr. McCarthy's notes are handwritten and difficult to read, he appeared to record that plaintiff had a job interview that day, was getting out more, and had a new girlfriend. On mental status exam, plaintiff appeared goal directed, with no suicidal or homicidal ideation, no signs of psychosis, and good mood. Plaintiff reported improved mood and sustained concentration. Dr. McCarthy continued plaintiff on Zoloft and Adderall. (Tr. at 240, 339.)

On August 30, 2007, plaintiff advised Dr. McCarthy that he was doing well and working two jobs. Dr. McCarthy renewed medications that day and again on October 1. Plaintiff missed

---

[5]GAF– the acronym for "Global Assessment of Functioning" – rates the severity of a person's symptoms and his overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 51-60 reflect "moderate" symptoms, 61-70 "mild" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

7

his scheduled follow up on October 26 (Tr. at 241, 338) but returned on November 1, doing well, reporting that he was cooking in a restaurant and took Adderall when working late. He denied depressive symptoms and reported functioning well at work. Dr. McCarthy renewed Zoloft and Adderall on that date and again on November 26, 2007. Plaintiff missed scheduled follow ups in February 2008. (Tr. at 242, 243, 337.)

Plaintiff returned to Dr. McCarthy on December 11, 2008, last seen about a year ago and having stopped taking his medications. Plaintiff indicated that he thought he was doing well but then lost his job. He was at the time working second shift in a bar. Dr. McCarthy restarted him on medications, including Adderall. (Tr. at 258, 336.)

On January 12, 2009, plaintiff told Dr. McCarthy, "I'm doing alright, getting progressively better." (Tr. at 257, 334.) Dr. McCarthy continued Adderall and Zoloft, and referred plaintiff to individual therapy. (Tr. at 257, 334.)

However, on January 22, 2009, plaintiff was admitted to the All Saints Medical Center from the Kenosha Hospital on an involuntary commitment following an overdose of street drugs in a suicide attempt. He had also cut and burned himself with a knife on both hands, producing first degree burns requiring dressing. Plaintiff related a long history of depression, self-mutilation, and suicide attempts, as well as a chronic history of drug and alcohol abuse. He tested positive for amphetamines and cannabinoid in the emergency room. (Tr. at 223-24, 303-05.) He had been working with Dr. McCarthy, who provided medication, but stated that "he will never go into counseling because it is a waste of time." (Tr. 223.) He further indicated that he had not told Dr. McCarthy anything truthful about his drug and alcohol abuse. (Tr. at 223.) Dr. A.K. Shah diagnosed mood disorder, not otherwise specified; polysubstance dependence; personality disorder with borderline features; and a GAF at the time of evaluation

8

20, highest around 60. Dr. Shah declined to provide Adderall because of significant drug dependence and Zoloft because of mood swings, instead starting plaintiff on Depakote and Risperdal. Plaintiff's prognosis was guarded because of his poor insight and motivation. (Tr. at 225.)

During the course of his hospital stay, plaintiff initially remained isolated, withdrawn, irritable, and dysphoric. During the latter part of his stay, however, he attended groups, agreed to refrain from drugs and alcohol, and to get some counseling and learn coping skills. He also later stated that he did not use as many drugs as he had claimed on admission. (Tr. at 227.) According to the January 27, 2009 discharge summary, plaintiff was to go to court for a 90 day hold open agreement for outpatient treatment with Dr. McCarthy. (Tr. at 226.) He was not at the time of discharge suicidal, but his motivation to address drug and alcohol issues seemed questionable. His prognosis was fair provided he followed up with treatment recommendations. (Tr. at 227.)

Plaintiff returned to Dr. McCarthy on February 12, 2009, 2-½ weeks after his discharge from the hospital. He reported that the Depakote was working better than previous drugs, and he was able to maintain control and manage stress. Dr. McCarthy renewed Depakote and Adderall. (Tr. at 255, 332.) Plaintiff was to start school to finish his HSED. (Tr. at 256, 331.)

On March 11, 2009, plaintiff advised Dr. McCarthy that he was doing alright, got a new job and going to school. Dr. McCarthy found him stable, with some occasional sleep disturbance. Dr. McCarthy renewed Depakote and Adderall. (Tr. at 254, 330.) On April 4, plaintiff reported things were going good; he was attending school and working. Dr. McCarthy continued medications. (Tr. at 253, 329.)

On May 7, 2009, plaintiff returned to Dr. McCarthy, reporting that he was still working

9

and going to school; his mood was "pretty good." (Tr. at 252, 328.) Dr. McCarthy noted him to be stable and active, with no persistent symptoms. Dr. McCarthy continued medications that day and again on June 1. (Tr. at 252, 328.) On June 18, plaintiff told Dr. McCarthy, "I'm fine," aside from a bacterial infection. Dr. McCarthy continued medications. (Tr. at 251, 327.) On July 27, Dr. McCarthy found plaintiff stable with no persistent mood disturbances, renewing Adderall and Depakote. Plaintiff missed his follow up appointment on September 3. (Tr. at 250, 326.)

On October 9, 2009, plaintiff was again admitted to the All Saints Medical Center from the Kenosha Hospital on a chapter 51 for making suicidal statements. Plaintiff admitted overdosing on various pills with the intention of committing suicide. He indicated that he had been off medications for about 1-½ months because he missed his appointment with Dr. McCarthy. He reported long-standing depression, along with problems of memory and concentration, and prior suicidal behaviors by burning himself and overdosing on medications. (Tr. at 217, 219, 301.) He admitted using alcohol, which was problematic years ago, but denied a current problem. He also admitted occasional marijuana use and past use of other illegal drugs, including intravenous heroin for two months years ago. His diagnoses on admission were mood disorder not otherwise specified, attention deficit disorder by history, and probable underlying personality disorder, with a GAF of 30. (Tr. at 220.) Plaintiff was admitted to the behavioral unit and started on Wellbutrin and Trazodone. (Tr. at 218, 220.) He did not attend groups during the initial part of his stay but reported improvement in mood, with no suicidal or homicidal ideation. He was discharged in stable condition on October 14, 2009, to follow up with Dr. McCarthy (Tr. at 218), with diagnoses of mood disorder, not otherwise specified; attention deficit disorder by history; probable underlying personality disorder; and a

10

GAF of 55 (Tr. at 217). On October 22, plaintiff returned to Dr. McCarthy, who resumed Depakote and Adderall. (Tr. at 247, 325.)

On October 30, 2009, Dr. McCarthy filled out a mental impairment questionnaire, indicating that he had treated plaintiff since June 4, 2007, and listing diagnoses of bipolar disorder and ADHD, with a current GAF of 60, highest in the past year 65. (Tr. at 244.) He checked symptoms of poor memory, sleep disturbance, mood disturbance, emotional lability, anhedonia, social withdrawal, blunt affect, feelings of guilt/worthlessness, difficulty concentrating, suicidal ideation or attempts, and hostility/irritability. (Tr. at 244-45.) As clinical findings, Dr. McCarthy wrote that plaintiff appeared dysphoric, with affect restricted and blunted. (Tr. at 245.) He opined that plaintiff would have difficulty working at a regular job on a sustained basis, with slight restriction of activities of daily living; marked difficulty in social functioning; marked deficiencies in concentration, persistence, and pace; and repeated (three or more) episodes of decompensation. (Tr. at 245-46.)

Plaintiff next saw Dr. McCarthy on November 19, 2009, indicating: "I'm doing alright but struggling a bit." (Tr. at 265, 324.) He reported periods of feeling good, followed by periods of not wanting to get out of bed. His mood instability over the past month caused difficulty at work. He also complained of insomnia, stating that Ambien had been helpful in the past. Dr. McCarthy increased the dose of Divalproex (Depakote), started Ambien, and renewed Adderall. (Tr. at 265, 324.) On December 14, plaintiff told Dr. McCarthy: "I'm doing alright." (Tr. at 263, 323.) The Ambien had been helping, but he continued to report mood instability. Dr. McCarthy continued medications. (Tr. at 263, 323.)

Plaintiff returned to Dr. McCarthy on January 25, 2010, reporting that he was isolating more, stable, but depressed and withdrawn at times. Dr. McCarthy continued medications.

11

(Tr. at 261, 291, 320.)  On March 8, plaintiff told Dr. McCarthy he was doing alright and planning to go to Florida to see family.  Dr. McCarthy noted him to be fairly stable, with some periods of increased depression.  He renewed medications including Adderall and Divalproex. (Tr. at 260, 290, 318.)

Plaintiff next saw Dr. McCarthy on September 16, 2010, indicating that he had been in Florida until six weeks ago helping his grandmother.  He described feeling depressed and could not find a job.  Dr. McCarthy started plaintiff on Trileptal and resumed Adderall.  (Tr. at 317.) On October 20, plaintiff reported stable mood with no down spells, but he missed his November 3 follow-up appointment (Tr. at 316), and when he returned in December indicated that he had been off his medications for two weeks resulting in irritability and depressed mood.  Dr. McCarthy renewed medications.  (Tr. at 315.)

On January 27, 2011, plaintiff advised Dr. McCarthy that he was exercising and socializing more.  He reported improved mood but increased insomnia.  Dr. McCarthy prescribed Sonata for sleep and renewed other medications.  (Tr. at 314.)  On February 24, plaintiff reported that the Sonata helped him stay asleep.  (Tr. at 313.)  On March 9, plaintiff reported sleeping 99% of the time with Sonata, with no day time drowsiness.  He further reported stable mood, not getting depressed or withdrawn.  Dr. McCarthy continued current medications.  (Tr. at 312.)

On March 12, 2011, Dr. McCarthy completed a mental impairment questionnaire, indicating that he saw plaintiff every one to two months since June 2007.  He listed diagnoses of bipolar disorder and ADHD, with a GAF of 65.  He indicated that plaintiff's mood had stabilized on Trileptal, his sleep improved on Sonata, and his motivation and focus improved on Adderall.  Plaintiff denied any current medication side effects.  (Tr. at 346.)  Dr. McCarthy

12

indicated that plaintiff's prognosis was good with continued treatment. (Tr. at 347.) In the section of the report pertaining to the B criteria, Dr. McCarthy assessed no to mild restriction of activities of daily living; moderate difficulty in maintaining social functioning; moderate deficiencies in concentration, persistence, and pace; and one or two episodes of decompensation within a twelve month period, each of extended duration. (Tr. at 348.) However, in assessing the C criteria, Dr. McCarthy checked that plaintiff had a medically documented history of a chronic organic, schizophrenic, or affective disorder of at least two years' duration that caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support, and three episodes of decompensation within twelve months, each at least two weeks long – writing in "when off medications." (Tr. at 348-49.) Dr. McCarthy further indicated that plaintiff would miss about four days of work per month due to his impairments. (Tr. at 349.) In an alcohol-drug questionnaire, Dr. McCarthy indicated that if plaintiff's substance abuse were to stop, his other impairments would still be disabling if not treated. (Tr. at 350.)

**2.    SSA Consultants**

On April 8, 2010, Joan Kojis, Ph.D, completed a psychiatric review technique form ("PRTF") for the state agency, evaluating plaintiff under Listings 12.02 (Organic Mental Disorders) based on his history of ADHD and 12.04 (Affective Disorders) based on his bipolar syndrome. (Tr. at 271-74.) Under the B criteria of the Listings, she found mild restriction of activities of daily living; moderate difficulty in social functioning; moderate difficulty in concentration, persistence, and pace; and no episodes of decompensation of extended duration. (Tr. at 281.) She found that the evidence did not establish the presence of the C criteria. (Tr. at 282.)

13

In a mental RFC assessment ("MRFC") report, Dr. Kojis found plaintiff "moderately limited" in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain regular attendance, complete a normal workday without interruptions from symptoms and perform at a consistent pace, interact appropriately with the public, accept instructions from supervisors, and respond appropriately to changes in the workplace. She found no significant limitations in the other areas listed on the form. (Tr. at 267-68.) In the narrative portion of the report, Dr. Kojis noted that plaintiff initiated treatment for mood swings, poor sleep, and problems with focus and attention in June 2007, doing well on Zoloft on Adderall before dropping out of treatment. He recommended treatment in December 2008 with similar symptoms and was hospitalized in January 2009 and October 2009 for suicidal thoughts and self-injurious behavior. However, Dr. Kojis noted that both admissions were associated with social stressors and drug abuse, with plaintiff failing to be forthright with his treating psychiatrist regarding his substance abuse. The record showed that when plaintiff complied with medication his mood stabilized and his ability to concentrate improved. Dr. Kojis further noted that plaintiff performed independent and appropriate daily activities, including part-time work, cooking, cleaning, and laundry. Dr. Kojis acknowledged the October 2009 report from Dr. McCarthy listing marked limitations in social functioning, and concentration, persistence, and pace. However, Dr. Kojis noted that this report was prepared just two weeks after a hospital admission when plaintiff had been off his medications for several months. Dr. Kojis stated that the report provided only a snapshot of plaintiff's functioning shortly after hospital admission, and that plaintiff's mood currently appeared stable with some variability related to situational stress. For these reasons, she gave Dr. McCarthy's October 2009 report little weight. Instead, based on the overall evidence, she

14

found that plaintiff retained the ability to understand and carry out simple instructions, complete a routine workday of simple repetitive tasks, and relate appropriately with coworkers and supervisors. She therefore concluded that he retained the ability to meet the basic mental demands of unskilled work with limited public contact. (Tr. at 269.)

On September 1, 2010, Roger Rattan, Ph.D, reviewed the evidence and affirmed Dr. Kojis's PRTF and MRFC as written. (Tr. at 292.)

## C.   Hearing Testimony

On April 13, 2011, plaintiff appeared with counsel before ALJ Timothy Malloy. The ALJ also summoned a vocational expert, Beth Hoynik. (Tr. at 46.)

### 1.    Plaintiff

Plaintiff testified that he was twenty-five years old, with an eighth grade education, indicating that he dropped out in the ninth grade due to behavioral problems and truancy. (Tr. at 50-51.) He testified that he received SSI up the age of eighteen. He saw multiple psychiatrists up to the age of seventeen or eighteen, at which point he stopped going; by the time he decided to seek treatment again he had lost insurance. (Tr. at 51-52.) For the past three years, he had seen Dr. McCarthy. He had no income (aside from scrap metal or aluminum he collected) and lived with his aunt. (Tr. at 52.) He used to have a girlfriend but had not dated a girl in close to four years. (Tr. at 52-53.) He indicated that about a year or two ago he got into trouble after an altercation with his cousin, with his aunt calling 911. (Tr. at 53.)

Plaintiff testified that he slept on the couch in his aunt's basement and spent his time watching TV, playing guitar, painting, and drawing, occasionally reading if something interested

15

him.  (Tr. at 54.)  When he did leave the house he would go to the skate park or play guitar by the lake.  He reported having one friend, with whom he would go the skate park, work on cars, or sit in the garage and listen to music.  (Tr. at 55-56.)

Plaintiff testified that he was hospitalized in 2009 after he overdosed on medication, cut his wrists, burned and whipped himself, because the hopelessness became too much.  (Tr. at 57.)  Plaintiff testified that he drank on occasion but had not used drugs in three to three and a half years.  (Tr. at 57-58.)  The ALJ pointed out that records from defendant's January 2009 admission suggested more recent use (Tr. at 224), but plaintiff explained that he lied at that time because he was desperate for help.  (Tr. at 58.)  The ALJ also pointed out that the records from the January 2009 admission stated that plaintiff had not told Dr. McCarthy "anything truthful" about drug and alcohol use, but plaintiff explained that he lied to the doctor at the hospital, not to Dr. McCarthy.  (Tr. at 59.)  Those records further quoted plaintiff as saying he would not go to counseling because "it's a waste of time."  (Tr. at 60.)  Plaintiff explained that he could only get group counseling, with which he did not feel comfortable.  (Tr. at 60.)  Plaintiff testified that the only treatment he currently received was medication from Dr. McCarthy; the only therapy available to him was group therapy, which he stated he would not be able to do; "I have a hard enough time talking about my problems to someone one-on-one in a room, let alone in a group[.]" (Tr. at 60.)

Asked why he could not work, plaintiff claimed an inability to cope with coworkers, including physical disagreements where he threw hammers and knives.  (Tr. at 61.)  His most recent job was at a Family Dollar store, where he worked for two or three weeks, stocking, cleaning, and running the register; the job ended after he got into a shouting match with someone because he kept mixing up the person's name.  He reported working at several

16

restaurants – cooking, waiting, and hosting.  (Tr. at 63.)  He indicated he could not maintain those jobs because of the high stress environment.  He worked at a Perkins Restaurant the longest, about eight months, because he had an understanding manager; she left and he ended up in a shouting match with the new manager within two weeks, shoved him, then stormed out.   (Tr. at 64.)  Plaintiff testified that he took Adderall, Restoril, and Trileptal, which he usually remembered to take; sometimes his aunt had to remind him.[6]  He felt the medication helped to a point.  (Tr. at 67.)

   **2.    VE**

   The VE surveyed plaintiff's past work at restaurants, noting that his earnings generally did not reach SGA levels.  She classified the work as light, with a skill level of two or three.  The ALJ and plaintiff's counsel agreed that plaintiff had no past relevant work.  (Tr. at 71.)

   The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, with no exertional limitations, limited to unskilled work involving simple, routine, and repetitive tasks; in a low stress job, including occasional work-related decisions and only occasional changes in the work environment; with no fast-paced production requirements; and no interaction with the public and only occasional supervision.  (Tr. at 71-72.)  The VE testified that such a person could perform custodial work, with 75,000 jobs in the state of Wisconsin; general production work, with 23,000 jobs in Wisconsin; and hand packaging work, with 18,000 jobs.  (Tr. at 72.)  She also mentioned food prep work, with approximately 10,000 jobs in Wisconsin.   The ALJ added to the hypothetical a quiet

_____

   [6]The record contains a letter from Joni Schurr (plaintiff's aunt), indicating that she had to remind him daily to take his medication.  When he failed to take it, he became agitated and angry, sometimes destroying things in the house.  (Tr. at 144.)  However, it appears that this letter was filed with the Appeals Council after the ALJ issued his decision.  (See Tr. at 209.)

environment, which eliminated the food service work and reduced the production and packing jobs by 50%, but had no real effect on the custodial jobs. (Tr. at 73.) Plaintiff's counsel added a restriction of only occasional interaction with coworkers, and the VE testified that her answer would not change, likening this restriction to occasional interaction with supervisors. (Tr. at 74.)

## D.    ALJ's Decision

On June 3, 2011, the ALJ issued an unfavorable decision. (Tr. at 20.) Following the five-step process, the ALJ determined that plaintiff had not worked since November 1, 2006, the alleged disability onset date, and that he suffered from the severe impairments of mood disorder and poly-substance abuse. (Tr. at 25.) The ALJ found that plaintiff's ADD caused no more than minimal limitations on plaintiff's ability to work and was thus non-severe. The ALJ noted that plaintiff received Adderall and Ritalin from a young age, with a good response to Adderall. (Tr. at 26.)

At step three, the ALJ determined that plaintiff's mental impairments did not meet or equal a Listing. Under the B criteria, he found that plaintiff had no more than mild restriction in activities of daily living, noting that plaintiff reported being capable of watching television, managing his personal care, preparing meals, cleaning, washing laundry, mowing the lawn, doing household repairs, riding a bicycle, counting change, shopping, playing guitar and drums, and reading. In the area of social functioning, the ALJ found no more than moderate difficulties. Plaintiff stated that he had no patience for anyone, got along with authority figures horribly, and never felt like being personable; however, the record indicated that he had a fiancé once and friends; plaintiff also testified that he liked to hang out with a friend at the skate park. In the area of concentration, persistence, and pace, the ALJ found no more than moderate difficulties. Despite indicating that he had trouble handling stress or change in

18

routine, and not finishing what he started, plaintiff admitted following written and spoken directions well, and testified to being an artist, playing guitar, and watching TV, all of which require some concentration, persistence, and pace. As for episodes of decompensation, the ALJ found that plaintiff had experienced none of extended duration.[7] (Tr. at 26.)

The ALJ then determined that plaintiff retained the RFC for a full range of work at all exertional levels but with the following non-exertional limitations: unskilled work involving simple, routine, and repetitive tasks; performed in a low stress work environment (involving no more than occasional work related decisions or occasional changes in work setting, and no fast paced production requirements); no more than occasional interaction with co-workers and no interaction with the general public. In making this determination, the ALJ considered plaintiff's alleged symptoms, finding that the record failed to fully substantiate his claims. (Tr. at 28.) The ALJ also considered the opinion evidence, giving great weight to the reports from state agency consultants Drs. Kojis and Rattan. (Tr. at 28.) The ALJ also gave great weight to the portion of Dr. McCarthy's March 2011 report opining that plaintiff had no to mild limitations in activities of daily living, and only moderate restrictions in social functioning and concentration, persistence, and pace. The ALJ found this portion of the report consistent with the overall medical record and plaintiff's GAF score of 65 (indicative of only mild symptoms). However, the ALJ gave little weight to the portions of the report stating that plaintiff had three episodes of decompensation within twelve months, each at least two weeks long, and that plaintiff would likely miss four days of work per month, as those findings were not supported by the record or Dr. McCarthy's own treatment notes. The ALJ likewise gave little weight to Dr. McCarthy's

---

[7]The ALJ also found the paragraph C criteria not satisfied. (Tr. at 26.)

October 2009 report stating that plaintiff had marked limitations in social functioning and concentration, persistence, and pace. This report was completed shortly after plaintiff's October 2009 hospital admission, when he had been off his medication for several months, and revealed only a snapshot of plaintiff's functioning shortly after the hospitalization. The ALJ found Dr. McCarthy's more recent report more consistent with the overall medical record. (Tr at 29.)

Based on this RFC, the ALJ concluded at step four that plaintiff could not return to his past work as a waiter because such work involved extensive contact with the public. (Tr. at 29.) However, the ALJ concluded at step five that plaintiff could perform other jobs as identified by the VE, including custodian, general production worker, hand packager, or food preparer. (Tr. at 30.) The ALJ therefore found plaintiff not disabled. (Tr. at 31.)

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in (1) weighing the medical opinions of record, (2) determining RFC, and (3) evaluating credibility. I address each argument in turn.

**A.    Medical Opinions**

**1.    Applicable Legal Standards**

The opinion of a social security claimant's treating doctor is entitled to "special significance," SSR 96-8p, and will be given "controlling weight" if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). If the opinion does not meet the test for controlling weight, the ALJ must determine what value the assessment does merit, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of

20

tests performed; and the consistency and supportability of the physician's opinion. Id. at 740; 20 C.F.R. § 404.1527(c). The ALJ must always offer "good reasons" for discounting a treating source opinion. Scott, 647 F.3d at 739.

Nevertheless, while a treating physician's opinion is important, it is not the final word on a claimant's disability. Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996). The ALJ, not a doctor selected by a patient to treat him, ultimately decides whether a claimant is disabled. Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). While the regulations provide that more weight will generally be given to the opinion of a treating physician than that of a non-examining consultant, see 20 C.F.R. § 404.1527(c)(1) & (2), the ALJ must consider that a treating source opinion may be unreliable if the doctor is sympathetic with the patient and thus too quickly finds disability, Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008); see also Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006). The ALJ must also weigh the opinions of state agency medical and psychological consultants, as they "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p. The claimant's regular physician may not appreciate how his patient's case compares to other similar cases, and therefore a consulting physician's opinion might have the advantages of both impartiality and expertise. Dixon, 270 F.3d at 1177. Thus, the ALJ may discount a treating physician's medical opinion if it is internally inconsistent, inconsistent with the opinion of a consulting physician, based solely on the patient's subjective complaints, or lacks support in the treatment record, so long as he minimally articulates his reasoning. See, e.g., Ketelboeter, 550 F.3d at 625; Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007); Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004); Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).

21

### 2.      Analysis

In the present case, the ALJ gave great weight to the opinions of the consultants, Drs.

Kojis and Rattan, and to portions Dr. McCarthy's March 2011 report, but he discounted Dr.

McCarthy's opinion regarding work absences and episodes of decompensation.[8]  On the final

point, the ALJ stated:

> [T]he undersigned gives little weight to the portions of the Questionnaire stating that the claimant had three episodes of decompensation within twelve months, each at least two weeks long and that the claimant would likely miss four days of work per month, as they are not supported by the record or Dr. McCarthy's own treatment notes.  The record shows that the claimant was hospitalized on two occasions in 2009, but only for six days in duration and Dr. McCarthy's notes show that the claimant is stable, exercising more, and getting out of the house.

(Tr at 29, record citations omitted.)[9]  Plaintiff challenges this determination on three grounds.

### a.      Episodes of Decompensation

Plaintiff first argues that the ALJ interpreted "episodes of decompensation" too narrowly,

focusing only on plaintiff's two, six-day hospitalizations.  The regulations define "episodes of

decompensation" as "'exacerbations or temporary increases in symptoms or signs

accompanied by a loss of adaptive functioning, as manifested by difficulties in performing

activities of daily living, maintaining social relationships, or maintaining concentration,

persistence, or pace.'"  Larson, 615 F.3d at 750 (quoting 20 C.F.R. Pt. 404, Subpart P., App.

---

[8]It was appropriate for the ALJ to consider Dr. McCarthy's March 2011 report in this fashion.  See SSR 96-5p ("Adjudicators must remember . . . that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one.").  The ALJ gave little weight to Dr. McCarthy's October 2009 report (Tr. at 29), a finding plaintiff does not challenge.

[9]As indicated above, in discussing the B criteria, Dr. McCarthy checked "one or two" episodes of decompensation (Tr. at 348), but under the C criteria he checked the box for "three episodes" – writing in "when off his medications."  (Tr. at 349.)

22

1, § 12.00). Incidents signaling the need for a more structured psychological support system – such as hospitalization or placement in a halfway house – qualify as episodes of decompensation, but so may other scenarios. Id. For instance, the Listing "recognizes that an episode may be inferred from medical records showing a significant alteration in medication." Id. The Listing defines "repeated episodes" as three within one year or an average of one every four months, each lasting for at least two weeks. Id. However, the Listing also states that for claimants who experience more frequent episodes of shorter duration the ALJ should determine if the duration and the functional effects are of equal severity. Id.

Plaintiff argues that the ALJ failed to address the medication changes noted in Dr. McCarthy's treatment records. However, he points to just a few scattered modifications between 2007 and 2011, and nothing in Dr. McCarthy's treatment notes suggests that these changes related to exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning. For instance, plaintiff notes that between June and August 2007, Dr. McCarthy increased Adderall from 15 mg to 30 mg. (Tr. at 239, 241.) However, the August 30, 2007 treatment note indicated that plaintiff was "doing well" and "working two jobs." (Tr. at 241.) Further, Adderall was prescribed to treat plaintiff's ADHD, which the ALJ found non-severe, a finding plaintiff does not contest. Dr. McCarthy did not increase plaintiff's Zoloft dosage at this time, maintaining it at 100 mg. (Tr. at 241.)

Plaintiff next notes that in July 2009 Dr. McCarthy added Depakote and discontinued Zoloft. (Tr. at 250.) Again, however, nothing in the treatment note indicated that this change related to a loss of adaptive functioning. To the contrary, the July 27, 2009 note stated that plaintiff was "stable," with "no persistent mood disturbances." (Tr. at 250.)

23

Plaintiff states that in January 2010 Dr. McCarthy increased the Depakote dose from 500 to 1000 mg. It is not clear from the January 25, 2010 treatment note that the Depakote dose was increased; in any event, that note also described plaintiff as "stable." (Tr. at 261.) Plaintiff indicates that Dr. McCarthy also prescribed Ambien at this time (Tr. at 261), but Ambien is a sleep medication, and plaintiff makes no claim of disability due to sleep problems.

Plaintiff next notes that in September 2010 Dr. McCarthy started him on Trileptal, apparently discontinuing Depakote. (Tr. at 317.) The note stated that plaintiff reported a significant weight gain on Depakote and so wanted to try a different medication (Tr. at 317); thus, the change to Trileptal had nothing to do with loss of adaptive functioning. At that time, plaintiff also reported increased mood swings, but he had been off his medications for several months while in Florida. (Tr. at 317.)

Finally, plaintiff notes that in January 2011 Dr. McCarthy added Sonata. (Tr. at 314.) At that time, plaintiff reported more stable mood but increased insomnia. (Tr. at 314.) Sonata is a sleep medication; as with the prescription for Ambien, this change does not reflect an episode of decompensation related to plaintiff's severe mental impairments.

The ALJ did not specifically discuss each of these treatment notes in his decision, but that was not necessary. See, e.g., Pepper, 712 F.3d at 362 ("In rendering a decision, an ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence.") (internal quote marks omitted). It was sufficient for the ALJ to note that plaintiff had been prescribed various medications for his symptoms, including Depakote, Trazodone, Wellbutrin, Adderall, and Ambien (Tr. at 28); that plaintiff's GAF scores consistently ranged between 55 and 65 when on medication, indicating no more than moderate to mild symptoms (Tr. at 28); and that Dr.

24

McCarthy's notes generally indicated that plaintiff was stable (Tr. at 29). As nothing in the medical record (aside from the two hospitalizations) suggested a loss of adaptive functioning, I cannot find reversible error in the ALJ's failure to further address this issue.

In his reply brief, plaintiff argues that checking the contents of the treatment notes for evidence of decompensation in connection with the medication changes would violate the Chenery doctrine, as the ALJ did not engage in this analysis. While it is true that a decision may not be defended on grounds that the ALJ did not embrace, e.g., Kastner, 697 F.3d at 648 (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943)), it is also true that the court need not remand if it is predictable with great confidence that the ALJ would simply reinstate his prior decision, Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010). Plaintiff concedes that Dr. McCarthy did not relate any of the medication changes to symptom exacerbation or loss of adaptive functioning; nor does plaintiff make any effort to now show how these changes evidenced decompensation. Thus, remand would be pointless. See Cain-Wesa v. Astrue, No. 11-C-1063, 2012 WL 2160443, at *18 (E.D. Wis. June 13, 2012) (rejecting challenge to ALJ's finding on decompensation where medication changes were generally related to financial issues, treatment notes recorded no significant exacerbations, and mental status exams were consistently unremarkable or unchanged); see also Sims v. Barnhart, 309 F.3d 424, 431 (7th Cir. 2002) (affirming where "none of the evidence that Sims contends the ALJ ignored or misstated establishes that her impairments met or equaled in severity the criteria under listings 12.02, 12.04, and 12.06"); Ramos v. Astrue, 674 F. Supp. 2d 1076, 1092 (E.D. Wis. 2009) (finding the ALJ's cursory discussion of the Listings at most harmless error where the plaintiff

25

made no serious effort to demonstrate that he met or equaled a Listing).[10]

### b. Number of Absences

Second, plaintiff argues that the ALJ failed to explain why he discounted Dr. McCarthy's opinion regarding decompensation and absences. I disagree; the ALJ found this portion of Dr. McCarthy's report internally inconsistent and inconsistent with the record, including Dr. McCarthy's own treatment notes. (Tr. at 29.) The ALJ reviewed plaintiff's treatment history in some detail, noting that his GAF scores consistently fell in the 55-65 range when medication-compliant, including a score of 65 (indicative of only mild symptoms) assigned by Dr. McCarthy in the March 2011 report. (Tr. at 28-29.) The ALJ further noted that in assessing the B criteria Dr. McCarthy found only mild to moderate restrictions, consistent with the overall medical record. (Tr. at 29.) However, Dr. McCarthy's statement that plaintiff experienced three episodes of decompensation, each at least two weeks long, was unsupported by the record, as plaintiff was hospitalized just twice during the relevant time period, for less than one week per admission. The ALJ also noted that Dr. McCarthy's treatment records described plaintiff to be stable, exercising more, and getting out of the house. (Tr. at 29.)

As with his previous argument, plaintiff points to several treatment notes the ALJ did not specifically discuss. For instance, in November 2009 plaintiff told Dr. McCarthy that he suffered periods of depression lasting one to four days where he did not feel like getting out of bed. (Tr. at 265.) However, this same treatment note indicated that plaintiff was working at

---

[10]As indicated, the ALJ is not required to discuss every piece of evidence; he need only sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993). A social security claimant cannot, consistent with this rule, accuse an ALJ of skipping medical records, then raise Chenery as a bar to any consideration by the Commissioner or the court of the importance of those records.

26

the time. Although Dr. McCarthy's notes are hand-written and hard to read, I discern nothing in this note indicating that plaintiff was missing work due to his symptoms. (Tr. at 265.) Plaintiff also points to a March 8, 2010 treatment note recording "some periods of increased depression lasting several days." (Tr. at 260.) However, this note also indicated that plaintiff was "fairly stable" and planning to go to Florida for several months to see family. (Tr. at 260.) The ALJ did not err in failing to specifically discuss these notes. See Henderson ex rel. Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir. 1999) (noting that while an ALJ may not ignore an entire line of evidence contrary to his findings, he need not provide a complete written evaluation of every piece of testimony and evidence).

Plaintiff further notes that Dr. McCarthy treated him for several years, long enough to know that he had trouble holding down a job. For instance, on December 11, 2008, Dr. McCarthy noted that plaintiff had lost several jobs since his last visit. (Tr. at 258.) However, the note also indicated that plaintiff had not been seen for one year and had stopped taking his medication. (Tr. at 258.) As the ALJ found, "when on medication, [plaintiff] has shown good response and improvement and his symptoms have been described as stable." (Tr. at 28.)

Finally, plaintiff notes that Dr. Kojis checked "moderately limited" in assessing his ability to maintain regular attendance (Tr. at 267), which he contends supports Dr. McCarthy's opinion regarding absences. However, in the actual RFC assessment section of this report, Dr. Kojis found that plaintiff "retains the ability to meet the basic mental demands of unskilled work with limited public contact." (Tr. at 269.) The ALJ did not err in crediting the more specific, narrative portion of Dr. Kojis's report, rather than the check-boxes. See, e.g., Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002) (finding that the ALJ did not err in relying on specific RFC assessment that the claimant could still perform low-stress, repetitive work, rather than finding

27

that the claimant was "moderately limited" in his ability to maintain a regular schedule and attendance); Malueg v. Astrue, No. 06-C-676, 2007 WL 5480523, at *7 (W.D. Wis. May 30, 2007) ("The ALJ relied on Dr. Matkom's psychiatric Review Technique Form Section III Rating of Functional Limitations and his notes in Section IV to conclude that plaintiff had only moderate limitations and could perform low stress routine work if she abstained from alcohol. The ALJ did not err by not using the Section I worksheet portion of the Mental RFC form in determining plaintiff's RFC finding.").

### c. Section 404.1527(c) Factors

Third, plaintiff argues that the ALJ failed to weigh Dr. McCarthy's opinion according to the 20 C.F.R. § 404.1527(c) factors. He notes that Dr. McCarthy, a psychiatrist, treated him over a four year period, in contrast to the consultant psychologists, who never examined him. The ALJ acknowledged plaintiff's treatment history with Dr. McCarthy. However, as discussed above, he found Dr. McCarthy's opinion regarding decompensation and absences inconsistent with the record, including Dr. McCarthy's own treatment notes. The ALJ instead credited the opinions of Drs. Kojis and Rattan, "highly qualified psychologists who are experts in the Social Security disability program, the rules in 20 CFR 404.1527(f) and 416.927(f), and in the evaluation of the medical issues in disability claims under the Act." (Tr. at 28.) The ALJ noted that the consultants both had an opportunity to review the entire medical record as of the date of their opinions (April 2010 and September 2010, respectively), and subsequent records failed to show significant worsening in plaintiff's symptoms. (Tr. at 28-29.) On the latter point, it is worth noting that Dr. McCarthy's March 2011 opinion was actually less restrictive than his October 2009 report. (Tr. at 269.)

Plaintiff argues that the ALJ did not specifically consider all of the checklist factors, but

28

that was not necessary.  See, e.g., Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) ("Ms. Oldham cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); Brown v. Barnhart, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) (stating that there is no articulation requirement for each factor, and that ALJs are not required to produce prolix opinions containing checklists from all of the regulations).  It is sufficient if the ALJ generally covers the ground of 20 C.F.R. § 404.1527(c) and provides "good reasons" for the weight assigned to the medical opinions.  See Hanson v. Astrue, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011).  The ALJ did so here.

Presented with conflicting reports, the ALJ had to choose which doctor to believe.  See Dixon, 270 F.3d at 1178.  The ALJ reasonably concluded that Dr. Kojis provided greater support for her opinion, and that her and Dr. Rattan's opinions were more consistent with the record as a whole.

## B.    RFC

### 1.    Applicable Legal Standards

RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities, despite his impairments, on a regular and continuing basis.  SSR 96-8p.  In setting RFC, the ALJ considers both the "exertional" and "non-exertional" capacities of the claimant.  Exertional capacities include the claimant's ability to perform each of seven strength demands – sitting, standing, walking, lifting, carrying, pushing, and pulling – typically classified in the categories of sedentary, light, medium, heavy, and very heavy work.  Non-exertional capacity includes all work-related functions that do not depend on physical

29

strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting) activities. SSR 96-8p.

RFC must be based on the entire record, including the medical evidence, reports of daily activities, and the claimant's testimony regarding his symptoms. SSR 96-8p. The RFC assessment must also include a narrative discussion, describing how the evidence supports the conclusions and explaining how any material inconsistencies in the evidence were considered and resolved. SSR 96-8p. The ALJ must in determining RFC consider the medical source opinions, and if the RFC assessment conflicts with an opinion from a medical source he must explain why the opinion was not adopted. SSR 96-8p. However, the ultimate determination of RFC is an issue for the ALJ to decide. 20 C.F.R. § 404.1527(d)(2).

**2.    Analysis**

In the present case, the ALJ found that plaintiff retained the RFC for a full range of work at all exertional levels, but with various non-exertional limitations, including low stress work with no more than occasional interaction with co-workers and no interaction with the general public. (Tr. at 27.) Although not listed in the RFC, the ALJ's hypothetical question to the VE also included a limitation of only occasional supervision. (Tr. at 72.)

Plaintiff argues that the ALJ made two errors in assessing RFC. First, he contends that the ALJ failed to incorporate into the RFC limitations based on the repeated episodes of decompensation found by Dr. McCarthy. Plaintiff contends that if he continued to experience such episodes he would not be able to sustain full-time work. As discussed above, the ALJ adequately explained why he did not accept Dr. McCarthy's opinion regarding decompensation

30

and work absences.

Second, plaintiff contends that the ALJ erred in finding that he could work with occasional supervision. In support of the argument, he points to his testimony of conflicts with co-workers and supervisors at his past jobs, including shouting matches and physical confrontations. (Tr. at 61, 63, 64.) Given these behaviors, he contends that it is unlikely that he could sustain work, even with just occasional contact with supervisors. However, an ALJ is not required to accept a claimant's testimony, and in this case the ALJ found that the record did not fully substantiate plaintiff's allegations. (Tr. at 28.) The ALJ discussed plaintiff's claims that he could not get along with others but found that the record showed that he was able to maintain relationships. (Tr. at 26.) Plaintiff notes that Dr. Kojis checked "moderately limited" in the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 268.) As discussed above, it was reasonable for the ALJ to rely on the consultant's narrative RFC determination, rather than the checkbox portion of the report. Here, Dr. Kojis specifically found that plaintiff retained the ability to "relate appropriately with coworkers and supervisors." (Tr. at 269.) The ALJ reasonably credited her opinions. (Tr. at 28-29.)[11]

## C.    Credibility

### 1.    Applicable Legal Standards

The ALJ must follow a two-step process in evaluating the credibility of a claimant's alleged symptoms. 20 C.F.R. § 404.1529(c); SSR 96-7p. First, the ALJ must determine whether the claimant has a medically determinable physical or mental impairment that could

---

[11]The ALJ also limited plaintiff to no more than occasional interaction with co-workers and no interaction with the general public, which reasonably accounted for his problems getting along with others.

31

reasonably be expected to produce his symptoms. If he does not, the symptoms cannot be found to affect his ability to perform basic work activities. SSR 96-7p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit his ability to perform basic work activities. If the claimant's statements are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of his statements based on the entire case record, considering, in addition to the medical evidence, the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, received for relief of symptoms; any measures other than treatment used to relieve the symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to the symptoms. SSR 96-7p; 20 C.F.R. § 404.1529(c).

Because the ALJ is in the best position to determine the claimant's truthfulness and forthrightness, the reviewing court will overturn an ALJ's credibility determination only if it is "patently wrong." Shideler, 688 F.3d at 310-11. The ALJ must provide specific reasons for the weight given to the claimant's statements, Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009), but this duty of articulation is minimal, e.g., Arbogast v. Bowen, 860 F.2d 1400, 1407 (7th Cir. 1988). Only when the ALJ's determination lacks any explanation or support will the court declare it patently wrong and deserving of reversal. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).

   **2.    Analysis**

In the present case, the ALJ discussed plaintiff's statements about his impairments and

32

their impact on his ability to function.  (Tr. at 27.)  He also summarized the medical evidence regarding plaintiff's symptoms and treatment.  (Tr. at 27-28.)  The ALJ noted that, despite his impairments, plaintiff was able to engage in a wide range of daily activities, including watching television, managing his personal care, preparing meals, cleaning, washing laundry, mowing the lawn, doing household repairs, riding a bicycle, counting change, shopping, playing guitar and drums, and reading.  Despite his alleged inability to get along with others, he was able to maintain some relationships.  And despite indicating that he had trouble handling stress or change in routine and not finishing what he started, plaintiff admitted following written and spoken directions well, and testified to being an artist, playing guitar, and watching TV, all of which require some concentration, persistence, and pace.  (Tr. at 26.)[12]

The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the symptoms of the types alleged; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 28.)[13]  In support of his determination, the ALJ indicated that the medical records failed to fully substantiate plaintiff's allegations of disabling symptoms.  Although plaintiff had a mood

---

[12]The ALJ's discussion of daily activities, social functioning, and concentration came at step three of the sequential evaluation process.  However, it is appropriate to read the ALJ's decision as a whole, considering his treatment of the record evidence in support of his conclusions at steps three and four/five.  See Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004).

[13]Although the parties do not discuss the issue, the Seventh Circuit has repeatedly criticized the "meaningless boilerplate" set forth in the block quote above.  See, e.g., Pepper, 712 F.3d at 367.  However, the ALJ also provided more specific reasons for his credibility determination, making his use of the boilerplate harmless.  See id. at 367-68; see also Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).

33

disorder, he consistently exacerbated his symptoms by failing to take prescribed medications, going as long as three years. The ALJ found it significant that both of plaintiff's hospitalizations in 2009 were preceded by his not taking medications for at least a month. When on medication, he showed good response and improvement, with his symptoms described as stable. His GAF had also been rated at 55-65 when on medication, indicating no more than moderate to mild symptoms. In addition, plaintiff had refused to go to counseling, calling it a waste of time, and testifying that he did not want to participate in group therapy. Finally, the ALJ noted that plaintiff was untruthful regarding his drug use, testifying that although he drinks alcohol on occasion he had not used drugs for 3 to 3 ½ years. However, the record showed that plaintiff tested positive for marijuana as recently as January 2009. The ALJ also found plaintiff's statement that he lied to doctors regarding his history of other drug use not credible. (Tr. at 28.)

Plaintiff attacks each of these reasons, essentially arguing that the ALJ should have weighed the evidence differently or drawn different inferences from it. The court's task on judicial review is not to make an independent credibility determination but to ensure that the ALJ minimally articulated his reasoning and supported his decision with substantial evidence. The ALJ did so here, and none of plaintiff's specific challenges have merit.

Plaintiff acknowledges that his hospitalizations occurred during periods of medication non-compliance, and that the record at times showed improvement in symptoms when he took his pills. However, he points to other occasions when he appeared symptomatic despite medication compliance. The issue for the ALJ was not whether plaintiff continued to experience symptoms – the ALJ agreed that he did – but whether those symptoms were disabling in severity, as plaintiff claimed. None of the treatment notes plaintiff cites

34

demonstrate disabling symptoms. On January 12, 2009, while plaintiff reported some mood swings, he also said, "I'm doing alright, getting progressively better." (Tr. at 257.) Dr. McCarthy also stated that plaintiff was "gradually more stable on Zoloft." (Tr. at 257.) On November 19, 2009, plaintiff reported periods of depression where he did not feel like getting out of bed, but it also appears that he was working at the time. (Tr. at 65.) When he returned on December 14, 2009, he continued to report some mood instability, but he also said he was "doing alright" and that the Ambien was helping. (Tr. at 263.) On March 8, 2010, while plaintiff reported some periods of increased depression, Dr. McCarthy assessed him as "fairly stable." (Tr. at 260.) The ALJ did not err by failing to specifically discuss each of these treatment notes.[14]

Plaintiff argues that the ALJ erred in concluding that his symptoms were caused by his failure to take medications, but the ALJ did not say that; rather, the ALJ noted that plaintiff experienced significant symptom exacerbations only when he stopped taking medications. Nor did the ALJ "cherry pick" from the psychiatrist's notes. A fair reading of the entire record supports the ALJ's conclusion that plaintiff was generally stable (if not entirely asymptomatic) when he took his medications.[15] As the ALJ noted, plaintiff maintained GAF scores between 55 and 65 when compliant. (Tr. at 28, 217, 244, 346.)

---

[14]In his reply brief, plaintiff argues that the ALJ also failed to specifically discuss his testimony regarding his problems interacting with co-workers and supervisors at Perkins Restaurant and the Family Dollar Store. (Tr. at 63-64.) Plaintiff testified that he could not handle the "high stress environment" associated with service positions. (Tr. at 64.) By specifically limiting plaintiff to low stress work with no more than occasional interaction with co-workers and no interaction with the general public (Tr. at 27), the ALJ reasonably accounted for these problems.

[15]The ALJ properly considered the record as a whole on this point, rather than focusing on single notations. Cf. Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011) ("As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.").

35

Plaintiff also argues that the ALJ should not have considered his refusal to attend counseling without considering his explanation at the hearing – that the only free therapy available to him was group therapy, which he did not want to do (Tr. at 60), but that he would see a counselor one-on-one if his insurance came through (Tr. at 69). <u>See</u> SSR 96-7p (stating that the ALJ must not draw any negative inferences from failure to seek regular medical treatment without considering any explanations the claimant may provide, such as inability to afford treatment and lack of access to free or low-cost medical services). However, the ALJ reasonably relied on plaintiff's past statement that "he will never go into counseling" – not because he could not afford it or even because he preferred one form of counseling to another – but "because it is a waste of time." (Tr. at 223; cited by the ALJ at 28.) The ALJ further relied on plaintiff's hearing testimony that he did not want to participate in group therapy. (Tr. at 28.) Even if, by the time of the hearing, plaintiff had changed his mind about the utility of counseling, nothing in SSR 96-7p required the ALJ to disregard his failure to seek treatment based on his preference for individual therapy, which he could not afford, over free group sessions. <u>Cf. Molina v. Astrue</u>, 674 F.3d 1104, 1114 (9th Cir. 2012) ("Although Molina provided reasons for resisting treatment, there was no medical evidence that Molina's resistance was attributable to her mental impairment rather than her own personal preference, and it was reasonable for the ALJ to conclude that the 'level or frequency of treatment [was] inconsistent with the level of complaints.'") (quoting SSR 96-7p).

Finally, plaintiff notes that the ALJ found him not fully credible because he was at the hearing untruthful about his polysubstance abuse. Plaintiff admits that he lied about his drug use but, relying on an unpublished Seventh Circuit decision, argues that the ALJ failed to explain how that dishonesty affected his credibility as a whole. <u>See Perkins v. Astrue</u>, 498 Fed.

Appx. 641, 644 (7th Cir. 2013) ("[T]he ALJ only briefly mentioned Perkins's dishonesty about his drug abuse, without explaining whether or how much this undermined Perkins's credibility.").

The ALJ provided a sufficient explanation in this case. The ALJ noted that while plaintiff testified that he had not used drugs for 3-½ years, the record contained a positive test for marijuana in January 2009. The ALJ further noted plaintiff's past inconsistent statements to his doctors about drug use. (Tr. at 28.) Specifically, during his January 2009 hospital admission plaintiff stated that he had "not told Dr. McCarthy anything truth[ful] about his drug and alcohol and prior treatment." (Tr. at 223.) At the hearing, plaintiff claimed that he lied to the doctors at the hospital, not to Dr. McCarthy, suggesting that he did so because he believed he "would receive some sort of treatment in some shape or form if they thought [he] was worse than just hurting [him]self and wanting to die." (Tr. at 58.) The ALJ reasonably found this explanation "not credible." (Tr. at 28.) See Rogers v. Barnhart, 446 F. Supp. 2d 828, 851-52 (N.D. Ill. 2006) (holding that the ALJ's credibility determination could not be overturned based on the claimant's implausible contention that she lied about the extent and recency of her drug use during in-patient treatment rather than to the ALJ at the hearing, particularly given the absence of evidence that such lies were necessary to gain access to the treatment facility).

## V. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of May, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

37